```
                  UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
```

PEDRO JUAN MAYSONET, JR.,   )
       Plaintiff    )
             v.    )   C.A. No. 10-cv-30137-MAP
                )
MICHAEL J. ASTRUE,          )
COMMISSIONER, SOCIAL        )
SECURITY ADMINISTRATION,    )
       Defendant    )

### MEMORANDUM AND ORDER REGARDING
### PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
### AND DEFENDANT'S MOTION FOR ORDER
### AFFIRMING DECISION OF THE COMMISSIONER
(Dkt. Nos. 8 & 11)

June 14, 2011

PONSOR, D.J.

### I. INTRODUCTION

This action seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Social Security disability insurance benefits. Plaintiff applied for benefits on November 15, 2007, alleging disability since May 11, 2002, due to asthma and unspecified problems with his back, shoulder, knee, and wrist. (A.R. 140.) After Plaintiff's

claim was denied, he requested an administrative hearing, which was held on September 30, 2009, before an administrative law judge ("ALJ"). On January 28, 2010, the ALJ issued his decision, finding that Plaintiff had not been disabled within the meaning of the Social Security Act, 42 U.S.C. § 1382c, since his date of application. (A.R. 4-15.) On May 7, 2010, the Decision Review Board denied Plaintiff's request for review, and Plaintiff subsequently appealed to this court.

Plaintiff has moved for judgment on the pleadings, and Defendant has moved for an order affirming the decision of the Commissioner. For the reasons stated below, the court will allow Defendant's motion (Dkt. No. 11) and deny Plaintiff's motion (Dkt. No. 8).

## II. FACTS

A. Personal Life and Work Experience.

Plaintiff is in his early thirties. He lives with his girlfriend and two of his four children, ages seven and two at the time of the hearing. He cares for them for less than thirty minutes at a time and primarily "watch[es] them while they watch TV." (A.R. 27.) He does not know the ages of his other children and has no contact with them. (A.R. 48.) He obtained a ninth-grade education, much of which he stated was in special education classes. His ability to read or

2

write in English is limited. (A.R. 28.) Although Plaintiff smoked marijuana daily until 2008, he testified that he no longer uses the drug. (A.R. 49.)

B. <u>Medical Evidence</u>.

Plaintiff's impairments primarily stem from injuries that he suffered in 2003 in a snowmobile accident and in two subsequent car accidents, one in October 2006, and the other on a date Plaintiff was unable to recall. (A.R. 35.) In addition to his specific injuries, Plaintiff testified that he has asthma, which he controls with a nebulizer and an inhaler. (A.R. 36.) He has to rest and use his inhaler after walking about one block. (A.R. 37.) Plaintiff also testified that he has trouble remembering things, for example, a shopping list of more than five items. (A.R. 44.)

    1. <u>Knees</u>.

On February 10, 2003, Dr. Jonathan Grenoble of Berkshire Orthopaedic Associates saw Plaintiff three weeks after his snowmobile accident. Plaintiff was complaining of pain in his knee, which Dr. Grenoble stated was consistent with a sprain of his anterior cruciate ligament ("ACL"). (A.R. 213.) Dr. Grenoble treated Plaintiff throughout 2004 and 2005 for the pain in his knee. (A.R. 217.) On May 30, 2006, after Plaintiff's final visit, Dr. Grenoble wrote

> Unfortunately, I do not think there is much else I
> would offer him.  Based on what is not a good
> record with the attendance of office appointments
> and physical therapy; I do not think he is a good
> surgical candidate at this time.  The procedure .
> . . is a very involved one, with complete patient
> cooperation and full dedication to the surgery and
> recovery is mandatory to get a good result, and we
> are just not seeing that here.

(A.R. 221.)

Nonetheless, nearly two years later, on March 25, 2008, Dr. Suk Namkoong performed surgery on Plaintiff's right knee to repair his ACL (A.R. 388), after which Plaintiff underwent extensive physical therapy.  On May 8, 2009, Dr. Namkoong reported, "The patient states he is coming around.  He still has some pain but overall feels that he is making progress."  (A.R. 427.)  By May 11, Plaintiff was reporting that his knee felt "pretty good."  (A.R. 373.)  His physical therapist reported that he was using a brace and was "progressing well towards goals."  (A.R. 396.)  By June 22, 2009, Plaintiff reported to his physical therapist that Dr. Namkoong had told him, "I'm doing good."  (A.R. 397.)  By July 22, 2009, Plaintiff's physical therapist reported that he "had tolerance to jogging."  (A.R. 398.)  On August 29, 2009, the physical therapist reported, "All goals achieved," and the sessions concluded.[1]  (A.R. 398.)

---

[1] Throughout the extensive notes concerning Plaintiff's physical therapy for his knee, none of Plaintiff's other alleged ailments are mentioned.

One month later at his hearing, Plaintiff testified that he continues to wear a brace on his right knee. (A.R. 34.) He testified that he cannot stand for longer than three minutes. (A.R. 40.) If he kneels down, he can get back up but only with difficulty. (A.R. 41.) He uses a cane when he climbs stairs. (A.R. 43.) When he sits for ten minutes, he must stand up to stretch or his leg stiffens and locks. (A.R. 39-40.)

2. <u>Eyes</u>.

A December 9, 2005, report from Berkshire Eye Center stated that Plaintiff's left eye had "poor vision" but his right eye was "normal," and that "[t]here should not be any visual reasons why he cannot perform everyday work duties." (A.R. 237.)

Plaintiff testified that he had partial vision in his left eye until several months prior to the September 2009 hearing, when he lost all vision in that eye. (A.R. 37.)

3. <u>Wrist</u>.

On December 22, 2005, Dr. Grenoble noted that Plaintiff had "a little smoldering tendinitis" in his left wrist. (A.R. 220.) On May 27, 2008, Plaintiff was seen at Berkshire Orthopaedic Associates for pain in his right wrist, which he described as "throbbing, constantly present, and moderate in intensity" since one of his car accidents. (A.R. 222.) The examination revealed "normal with full,

painless range of motion, no palpable tenderness and no obvious deformities" and "no evidence of fracture." (Id.)

Plaintiff testified that he is unable to squeeze with his hands due to wrist pain. His hands "swell up and lock up." (A.R. 35.) He cannot carry a gallon of milk across the kitchen with just one hand. (A.R. 42.) He cannot use a computer because his thumbs bother him. (A.R. 43-44.)

4. Shoulder.

In March 2007, Dr. Joshua Yurfest assessed Plaintiff and opined that he had bursitis in his shoulder. (A.R. 287.) An October 26, 2007, physical therapy evaluation noted that Plaintiff had intermittent pain in his shoulders that sometimes spread to his hands. Although Plaintiff reported that he was able to do push-ups twice a week, they bothered his arms. (A.R. 293.) On December 4, 2007, Plaintiff's physical therapist noted improvements in his shoulder functioning and decreased pain. (A.R. 303.)

5. Back.

The results of an October 2006 CT scan performed on Plaintiff's spine and brain following one of his car accidents were "unremarkable." (A.R. 246.)

On September 21, 2007, Plaintiff was seen by Dr. Joan McFadden for a physical exam at which he complained of back pain. She reported that he was a "well-developed, well-nourished male in no acute distress." (A.R. 265.) On

October 9, 2008, Dr. McFadden recommended various medications, including a Lidocaine patch to relieve Plaintiff's back pain, which she referred to as a "chronic issue." (A.R. 339.) On March 3, 2009, Plaintiff reported to Dr. Andrew DeMaggio of the New England Pain Diagnostic and Treatment Center that his back pain had increased to eight on a scale of ten. An MRI at that time showed a completely normal spine. (A.R. 360.)

    6. <u>Pain</u>.

From March 29, 2007, through November 19, 2007, Plaintiff was seen for pain in his back, knee, and shoulder by internist Dr. Joshua Yurfest, who prescribed various medications as well as physical therapy. (A.R. 274-88.) Dr. Yurfest diagnosed Plaintiff with bursitis in his shoulder, myofascial pain syndrome,[2] and somatic dysfunction. (A.R. 275.) He injected Plaintiff's trigger points with steroids and noted that X-rays and CT scans were normal. (A.R. 275, 277.) In July 2007, Dr. Yurfest reported that Plaintiff's pain score was a four and that he was "40% improved from our first visit." (A.R. 280.) On November 19, 2007, he reported that Plaintiff's pain score was a seven because he was sore from doing housework. (A.R. 274.)

---

    [2] A rheumatic syndrome similar to fibromyalgia.

An October 9, 2008, report from Family Practice Associates noted that Plaintiff was complaining of knee and back pain from a fall three weeks prior. (A.R. 332.)

On February 29, 2009, Dr. DeMaggio reported that Plaintiff was complaining of back, shoulder, hand, and knee pain, which he described as five-to-eight on a scale of ten and constant. Dr. DeMaggio opined that Plaintiff's symptoms correlated most likely with "diffuse myofascial condition." (A.R. 354.)

On April 29, 2009, Plaintiff completed a pain questionnaire, in which he stated that he felt constant stabbing pains in his knee, sharp pain in his chest, and that he had frequent migraines due to pain in his eye. (A.R. 197.) He wrote, "the more I do, the more pain I have." (A.R. 197.) He also stated that he stops activities due to pain every few minutes. (A.R. 198.)

Plaintiff testified that, although the pain in his back and shoulders is intermittent, he feels pain in his legs all the time, and it is exacerbated by walking or any physical activity, including playing with his children and helping around the house. (A.R. 38.) His girlfriend does the laundry, shopping, and cooking. (A.R. 44.) He is able to make sandwiches and, depending on his pain level, fold laundry and put it away. (A.R. 149, 199.) He occasionally accompanies his mother shopping. (A.R. 150.) He gets

minimal sleep, three-to-six hours each night, because he is uncomfortable. (A.R. 44.) Plaintiff stated that no medications relieve the pain, which he rated at a seven or eight on a scale of ten. (A.R. 38.)

C.  Ability to Work.

1. Plaintiff's Testimony About His Ability to Work.

In the months leading up to his hearing, Plaintiff had applied for seven jobs at large chain stores and restaurants. (A.R. 31.) He was interviewed by two of the stores but was not hired after he disclosed that he "can't really lift up heavy stuff." (A.R. 32.) Plaintiff testified that he would like to work but did not think that he could "make it in a workplace." (A.R. 45.) Because of his lack of sleep, he testified that he would frequently be late and would "always [be] dragging at work." (A.R. 46.) He testified that he is good with math and, for example, could make change but that his difficulties with standing and sitting would prevent him from performing any job. (A.R. 46-47.)

With respect to past work, although he had worked at a variety of jobs, including landscaping and in fast-food restaurants, Plaintiff usually quit those jobs after about six months. (A.R. 30.) Plaintiff testified that until he stopped smoking marijuana in 2008, he supported his $50.00 per week habit with "side jobs," for example, working for

his landlord. (A.R. 49.)

2. <u>Evidence of Ability to Work</u>.

The only opinion regarding Plaintiff's ability to work comes from State Examiner Dr. Robert McGan who completed a Physical Residual Functional Capacity Assessment of Plaintiff on January 2, 2008, two months prior to his knee surgery. (A.R. 314-321.) As a diagnosis, Dr. McGan indicated that Plaintiff's impairments were located in his lower back, right knee, and wrist.[3] (A.R. 314.) He opined that Plaintiff could occasionally lift or carry up to twenty pounds, frequently lift ten pounds, stand, sit, and walk for six hours in an eight-hour workday, and push or pull with no limits. (A.R. 314.) He further opined that Plaintiff could frequently climb, balance, kneel, and crawl, and occasionally climb ladders, stoop, and crouch. He noted Plaintiff's visual limitations in the areas of depth perception and field of vision, with no limitations in near or far acuity, accommodation, or color vision. (A.R. 317.) He concluded that "light exertion is reasonable." (A.R. 316.) Finally, he noted that Plaintiff's credibility was "partial" and that the medical evidence "does not appear to support the severity of the allegations." (A.R. 316, 319.)

The record also contains several notes that Plaintiff's

---

[3] Specifically, Dr. McGan wrote, "LB, shoulder, R knee and fx wrist '02-06." (A.R. 314.)

doctors provided to him regarding his ability to work. On
May 27, 2008, when Plaintiff was seen at Berkshire
Orthopaedic Associates for wrist pain, the doctor's report
stated, "Mr. Maysonet can work full duty with no
restrictions." (A.R. 222.) On June 15, 2009, Dr. Namkoong
provided Plaintiff with a letter stating that he would be
"limited in his ability to work for approximately 3-6
months." (A.R. 431.) Two weeks later, on June 22, 2009,
Dr. Namkoong wrote in his medical notes, "[t]he patient is
doing well. . . . He [may] return to light duty with no
climbing or ladders. I will see him back in 2 months. At
that time he may be ready for full duty." (A.R. 432.) The
final exhibit in the record is Dr. Namkoong's June 22 note
to Plaintiff stating that Plaintiff may resume "light duty
work . . . no ladders, no climbing." (A.R. 443.)

D. The ALJ's Findings.

The SSA disability determination is subject to a five-
step process under 20 C.F.R. § 404.1520. At Step 1, the ALJ
determined that Plaintiff had not engaged in substantial
gainful activity since the date of the filing of his
application on November 14, 2007.

At Step 2, the ALJ determined that Plaintiff had the
following severe impairments: history of right knee
arthroscopy for meniscal tear in 2003, with residual
problems, exacerbated in 2008, eventually requiring ACL

11

reconstruction, with ongoing instability; cervical and lumbosacral myofascial pain; bilateral shoulder pain, later onset of bilateral hand swelling and numbness; history of asthma; and limited vision in left eye.  (A.R. 9.)

At Step 3, the ALJ determined that none of these impairments medically equaled a listed impairment.

At Step 4, the ALJ determined that Plaintiff had:

> a residual functioning capacity to perform sedentary work. . . . He could lift and carry ten pounds frequently and ten pounds occasionally.  He could sit about six hours and stand or walk two hours in an eight-hour workday, but he would need to be able to sit or stand at will.  The claimant would be limited to no more than occasional extended forward or overhead reaching no concentrated exposure to dust, fumes, strong odors, and temperature or humidity extremes.  The claimant would be limited to no work requiring close visual acuity or left peripheral vision and no more than occasional forceful grasping, twisting, and fine manipulation.

(A.R. 11.)

At Step 5, the ALJ determined that Plaintiff could not perform his past work as a roofer, fast-food worker, or janitor but had the residual functioning capacity ("RFC") to perform two specific jobs identified by the Vocational Expert ("VE"): surveillance system monitor and mall information clerk.[4]  (A.R. 14.)

---

[4] The ALJ posed a hypothetical to the Vocational Expert regarding an individual with limited visual acuity, limited to sedentary work with no more than an occasional need to reach forward or overhead and with no exposure to dust, fumes, strong odors, temperature, or humidity extremes.

III. DISCUSSION

Plaintiff's sole argument on appeal is that the ALJ erred at Step 4 because his determination of Plaintiff's RFC was not supported by substantial evidence. Unfortunately for Plaintiff, the record contains ample support for the ALJ's conclusion.

A. Standard of Review.

Judicial review of a final decision of the Commissioner is limited to whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the administrative law judge. See id. at 10. The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evidence "as a

---

(A.R. 54.) The VE found the lack of depth perception to be particularly limiting and was able to identify only two positions: surveillance system monitor, of which there are 107 positions in the regional economy, and mall information clerk, of which there are 150 positions in the regional economy. (A.R. 55.) The ALJ questioned whether an additional limitation of no more than occasional grasping or twisting would change the VE's answers, to which he responded that they would not. (A.R. 56.) Finally, the ALJ queried whether regular absenteeism or tardiness would further limit the positions, and the VE responded that they would eliminate all employment possibilities. (A.R. 56.)

reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B. <u>Residual Functioning Capacity</u>.

Plaintiff contends that in arriving at his RFC, the ALJ ignored the evidence of his chronic pain and discounted its impact on his "ability to perform in a work environment." (Dkt. No. 9, Pl.'s Mem. at 11.) The ALJ, for his part, characterized the RFC as "generous." (A.R. 11.)

Without question, as documented above, the record is replete with evidence of Plaintiff's complaints of pain. Such complaints, however, are simply insufficient for the ALJ to have made a determination that Plaintiff's pain rendered him disabled. According to the Social Security regulations:

> you can only be found disabled if you are unable
> to do any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment . . . . Your impairment must result
> from anatomical, physiological, or psychological

14

> abnormalities which are demonstrable by medically
> acceptable clinical and laboratory diagnostic
> techniques.

20 C.F.R. § 416.927(a).

Here, the record lacks even a single medical opinion that any of Plaintiff's impairments hinder his ability to perform substantial gainful activity.[5] In determining that Plaintiff could work as a surveillance system monitor or as a mall information clerk, the ALJ did not improperly discount any medical opinions or "substitute his own judgment for uncontroverted medical opinion." Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994). Indeed, despite the complete absence of any medical opinion that Plaintiff's pain limited his ability to work, the ALJ took Plaintiff's complaints at face value and presented a significantly limited RFC that required Plaintiff to be sedentary but to be able to stand at will; carry no more than ten pounds; reach forward and up on a very limited basis; have no exposure to factors that would aggravate his asthma; rarely use his hands; and require vision in only one eye. (A.R.

---

[5] In this way, Plaintiff's case differs significantly from that of the plaintiff in Johnson v. Astrue, in which the First Circuit held that a diagnosis of fibromyalgia relies on a patient's subjective complaints of pain and, thus, that the ALJ erred in giving little weight to the plaintiff's rheumatologist's RFC assessment, based primarily on the plaintiff's complaints of pain, that the plaintiff could perform no work. 597 F.3d 409, 411-12 (1st Cir. 2009).

11.)  Significantly, the ALJ's RFC assessment imposes more restrictions than those recommended by Dr. McGan and requires Plaintiff to do barely more than he does at home.

Finally, the court observes that Plaintiff had applied for seven jobs in the months leading up to his hearing. Such active participation in the job market -- specifically seeking jobs markedly more physical than those suggested by the VE -- provides evidence that even Plaintiff did not actually perceive himself as completely unemployable.  In any event, Plaintiff's medical record provides substantial evidence, and perhaps more than substantial evidence, that Plaintiff is capable of working at least at the level posed by the ALJ.  Under these circumstances, the court simply cannot conclude that the ALJ erred in assessing Plaintiff's RFC.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 8) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 11) is hereby ALLOWED.  The clerk will enter judgment for Defendant.  The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR

U. S. District Judge